**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 11, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2020AP2064**

**STATE OF WISCONSIN**

Cir. Ct. No. 2012CF870

**IN COURT OF APPEALS**
**DISTRICT III**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

DENNIS J. GROSS,

    DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Outagamie County: EMILY I. LONERGAN,[1] Judge. *Affirmed*.

Before Stark, P.J., Hruz and Donald, JJ.

---

[1] Judge Michael W. Gage presided over the trial and Judge Nancy J. Krueger handled some proceedings, but Judge Emily I. Lonergan handled the postconviction motion at issue on this appeal.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dennis Gross appeals from an order denying his postconviction motion for plea withdrawal. Gross contends that he entered his no-contest pleas as the result of ineffective assistance of counsel during a trial to the circuit court. We conclude that Gross's trial counsel did not perform deficiently and affirm.

## BACKGROUND

¶2 This case has a long and complex procedural history. The State charged Gross with attempted first-degree intentional homicide, two felony counts of strangulation, and four misdemeanors. Gross did not contest the misdemeanors or one of the strangulation counts, and he sought a trial to the court on the attempted homicide count and the remaining strangulation count.

¶3 At trial, a woman, whom we will call "Dana,"[2] testified as follows. Dana said that she and Gross began dating in 2011 and moved in together shortly thereafter, along with Dana's three children. In October of 2012, Gross and Dana got into a fight, after which Gross threw out Dana's clothing, and Dana decided to leave the relationship. A few days after the clothing incident, Dana returned to the house she had shared with Gross looking for one of her daughters, who, according to Gross, was sleeping there.

---

[2] This matter involves the victim of a crime. Pursuant to WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym instead of the victim's name. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶4     When Dana entered the house, Gross locked the door behind her. Upon discovering that her daughter was not in the house as Gross had claimed, Dana went into the bathroom to call her sister for help because she believed things were going to "be ugly." Gross entered the bathroom and took Dana's phone and refused to give it back. Gross then threw Dana from the toilet onto the floor so violently that the toilet seat broke off, and he began calling her a "slut" and a "whore." As Dana lay on the floor, Gross tried to force a toothbrush down her throat, and he then began hitting her head with the toilet seat as she cried, begged him to stop, and tried to get away. Gross then tried to push Dana's head into the toilet, saying, "You're going to die, Bitch." At that point, Dana was able to push him away and run out of the bathroom.

¶5     Gross caught up to Dana in the living room, again threw her on the ground, straddled her, and began hitting her in the face. Gross then grabbed a nearby broom and pressed it against Dana's throat, choking her. When Dana rolled over onto her stomach in an attempt to protect herself, Gross began beating her on the back with the broom. Gross then "jump[ed]" on Dana's chest more than once, with his knee making contact in an area where she had triple bypass surgery. While jumping on her chest, Gross told Dana he was "going to break these fuckin' wires so hopefully they'll stab you in the heart and you'll die," and he also said, "We're both going to die. You're going to die first, and then I'll kill myself." Gross next began choking Dana with his hands around her neck until she began "seeing stars," while repeatedly asking her, "Are you going to die yet, Bitch? When are you gonna fuckin' die?"

¶6     As Dana lay curled up in a fetal position crying, Gross got up, kicked Dana multiple times, retrieved a hammer, and then used the claw end of the hammer to try to pry Dana's teeth out. Gross next pulled off Dana's pajama

bottoms and hit her hand with the hammer when she tried to resist. Gross told Dana, "This hammer's going up your fuckin' ass," and he tried to insert the handle end in her anus. Finally, Gross "took a break" and lay down on the couch with the hammer. Dana ran out of the house and sought help from a neighbor.

¶7      The neighbor called 911. At trial, the neighbor testified that Dana was wearing only a T-shirt and appeared "beaten and bloody" with injuries to her face and hand. The responding police officer also observed that Dana had multiple injuries and further noted that she was crying and appeared to have difficulty breathing. The officer contacted dispatch to request medical assistance, and Dana was transported first to a medical center and then to a hospital, where her injuries were examined and documented by two nurses. Meanwhile, police searched Gross's house and photographed the tank of the toilet which was on the floor, the lid which "had been ripped completely off the toilet," a hammer on the sofa, clothing scattered on the floor, a broom handle in the hallway, and blood on the bathroom floor. Shortly thereafter, based upon a tip, police apprehended Gross hiding in the basement of a nearby house.

¶8      The defense presented no witnesses. The circuit court conducted a colloquy to verify that Gross knowingly and voluntarily waived his right to testify. Following the close of evidence but before closing argument, Gross reached a plea agreement with the State pursuant to which he pled no contest to a reduced charge of first-degree recklessly endangering safety, one of the strangulation counts, and all of the misdemeanors, with the remaining strangulation count dismissed and read in. All but one of the pled-to counts included a domestic abuse enhancer. The court sentenced Gross to seven years and six months of initial confinement followed by five years of extended supervision on the reckless endangerment count, with a consecutive sentence of one year of initial incarceration and one year

extended supervision on the count of witness intimidation and with lesser concurrent sentences on the strangulation, battery, and disorderly conduct counts. The court also imposed a consecutive one-year term of probation on the trespass count.

¶9     Gross filed a notice of intent to seek postconviction relief. However, after his appointed postconviction counsel, Ann Auberry, advised him that she had found no arguably meritorious appellate issues, Gross, pro se, agreed to close his file without pursuing a direct appeal. Gross subsequently filed two pro se motions and an appeal seeking to obtain materials from his case file that he claimed not to have received from Auberry.

¶10    In 2017, Gross filed a pro se postconviction motion and amended motion under WIS. STAT. § 974.06, seeking relief from his convictions on the following grounds: (1) an "unconstitutional search and seizure" because authorities took materials from Gross's jail cell without a warrant; (2) ineffective assistance of Gross's first trial counsel, Leonard Kachinsky, for withdrawing under "false pretense," leading to a violation of Gross's right to a speedy trial; (3) a "coerced confession" and infringement of Gross's right against self-incrimination because Gross's second trial counsel, Jeffrey Jazgar, advised him to "concede to things he did not do"; (4) "perjured testimony" by Dana during Gross's abandoned trial to the court; and (5) lack of jurisdiction to impose sentence on Gross as a result of the other alleged errors. The circuit court scheduled an evidentiary hearing on Gross's postconviction motion and appointed a new attorney, Chadwick Kaehne, to represent Gross.

¶11    Kaehne filed a supplement to Gross's postconviction motion, raising an additional claim that Jazgar provided ineffective assistance by failing to

challenge the domestic abuse penalty enhancements. Kaehne subsequently withdrew from representing Gross, citing irreconcilable differences, and the circuit court appointed Attorney Erica Bauer to represent Gross at the postconviction motion hearing. Bauer advised the court that it was her intention to proceed solely upon the supplemental motion filed by Kaehne. In response, Gross informed the court that it was not his intention to abandon the claims in his initial postconviction motion. At an evidentiary hearing held in 2019, the court directed Bauer to proceed on the penalty enhancement claim but it appointed Attorney Robert Meyeroff to succeed Bauer. The court then issued a written order denying the penalty enhancement claim, but expressly holding open the issues Gross raised in his original postconviction motion so that Meyeroff could "explore the matters further."

¶12 Meyeroff subsequently filed a second supplement to the postconviction motion, alleging that Gross was induced to enter his pleas because his trial counsel provided ineffective assistance by: (1) failing to have Gross testify at his abandoned trial in support of a self-defense claim; (2) failing to interview or call additional witnesses identified by Gross who could address Dana's character; (3) failing to obtain and introduce Dana's medical records regarding a condition that made her bruise easily; (4) failing to challenge Dana's credibility based upon her bipolar disorder and use of Adderall; and (5) failing to question why no bite marks were found on a toothbrush that Dana testified she had bitten when Gross shoved it down her throat.

¶13 The circuit court held a second evidentiary hearing on Gross's still-pending plea withdrawal motion, this time focused on the claims developed in Meyeroff's supplement. Jazgar testified that, after reviewing all the discovery materials, he and Gross had jointly decided upon a trial strategy of maintaining

that the State had overcharged Gross based upon what had actually occurred and it could not meet its burden of proof. Although he could no longer specifically recall his conversations with Gross about taking the stand, Jazgar testified that he would have advised Gross about the dangers of cross-examination and the introduction of Gross's prior convictions. Jazgar did not investigate or present any other witnesses because Gross and Dana "were the only two parties there that night."

¶14 Gross testified that he had told Jazgar details about the fight that differed significantly from Dana's account—including that Dana had initiated physical contact during the incident by biting his leg in the bathroom, by attacking him with a broom while he was sitting on the couch in the living room, and by grabbing a hammer and hitting him with it on the head after the two struggled over the broom. Gross said Jazgar advised him not to testify because the district attorney would "eat [him] alive," Gross would not be able to explain all of Dana's bruising, and no one would believe him.

¶15 Gross further testified he had told Jazgar months before trial that Dana's sister could testify about how much Dana had to drink prior to the incident and if she had been taking drugs that night, about prior bar fights Dana had participated in, and about Dana's reputation for being untruthful. Gross also told Jazgar about another man who could have testified to Dana's "character, her fighting, her lying, her drinking and drug use." Finally, Gross asserted he had told Jazgar that Dana was bipolar and suffered from a condition that led her to bruise more easily than the average person. Gross did not produce any of these proposed witnesses at the hearing to corroborate his assertions as to what testimony they could have provided.

7

¶16    The circuit court determined that Jazgar had followed a reasonable defense strategy of challenging the State's ability to meet its burden of proof and that any evidence regarding Dana's alcoholism or mental health issues was not relevant to the defense theory. The court issued a final written order denying Gross's supplemented postconviction motion, from which Gross appeals.

## DISCUSSION

¶17    On this appeal, Gross renews the claims from the second supplement to his postconviction motion that he should be allowed to withdraw his no-contest pleas because Jazgar: (1) advised him not to take the stand; and (2) failed to investigate or call any witnesses to challenge Dana's credibility.

¶18    As a threshold matter, the State contends that Gross's current claims are procedurally barred by his prior discovery motions and appeal and by his failure to include the claims as they are currently framed in his initial pro se postconviction motion. *See generally **State v. Escalona-Naranjo***, 185 Wis. 2d 168, 185, 517 N.W.2d 157 (1994). We note, however, that the discovery motions and appeal did not themselves seek relief from Gross's convictions. Rather, they sought assistance in assembling the materials Gross believed he needed to file his postconviction motion under WIS. STAT. § 974.06. Additionally, we are not persuaded that the second supplement to Gross's postconviction motion—which expanded upon aspects of the original motion related to Dana's credibility and Gross's claim of innocence—constituted a separate, successive motion. Rather, given that the circuit court expressly held open issues from the original motion and invited counsel to "explore" those issues, we view the second supplement as a continuation of Gross's original postconviction proceeding seeking plea

8

withdrawal. We therefore decline to apply a procedural bar here and will address the merits of Gross's current plea withdrawal claims.

¶19 A defendant seeking to withdraw a plea after sentencing on grounds other than a defective plea colloquy must demonstrate by clear and convincing evidence that refusal to allow plea withdrawal would result in a "manifest injustice," raising "serious questions affecting the fundamental integrity of the plea." *State v. Dillard*, 2014 WI 123, ¶83, 358 Wis. 2d 543, 859 N.W.2d 44 (citation omitted). One way to demonstrate manifest injustice is to show that the defendant received ineffective assistance of counsel. *Id.*, ¶84.

¶20 We employ a mixed standard of review to claims of ineffective assistance of counsel. We will uphold the circuit court's findings of evidentiary fact unless they are clearly erroneous. *State v. Jeninga*, 2019 WI App 14, ¶13, 386 Wis. 2d 336, 925 N.W.2d 574. We will independently determine, however, whether those facts establish a violation of the defendant's constitutional right to counsel. *Id.* Additionally, in making the ultimate determination as to whether a manifest injustice has occurred, we may consider the totality of the circumstances shown in the record—including post-plea materials. *State v. Thomas*, 2000 WI 13, ¶18, 232 Wis. 2d 714, 605 N.W.2d 836.

¶21 To establish a claim of ineffective assistance, a defendant must prove two elements: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. We need not address both elements of the test if the defendant fails to make a sufficient showing on one of them. *State v. Swinson*, 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12. Here, we conclude that Gross has failed to demonstrate that his trial counsel performed deficiently.

¶22 In order to demonstrate deficient performance, a defendant must overcome a presumption that counsel's actions fell within a wide range of reasonable professional conduct. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citation omitted). "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Reasonable strategic choices informed by counsel's investigation of the law and facts are virtually unchallengeable on appeal. *Id.* at 690.

¶23 Here, the circuit court's factual finding that Jazgar made a strategic decision to challenge the State's ability to meet its burden of proof is directly supported by Jazgar's testimony at the second postconviction hearing and is not clearly erroneous. That strategy was reasonably premised upon Dana's own acknowledgement that Gross had discontinued the attack and lay down on the couch—actions that could be argued to undermine the necessary element of intent for the attempted first-degree homicide charge. Given that the defense strategy did not require disproving Dana's account of the attack, Jazgar had no need to investigate or present additional witnesses to undermine Dana's credibility. Moreover, further cross-examination of Dana could have backfired, given her extensive injuries. Similarly, Jazgar soundly advised Gross about the dangers of cross-examination insomuch as Gross had no credible way to explain the extent of Dana's injuries in comparison to his own lack of injuries. Again, it was reasonable to advise Gross to avoid that danger by not testifying when the defense

strategy did not depend upon discrediting Dana. Therefore, Jazgar's performance was not deficient.

¶24 Although we could end our analysis there, we further note that Gross failed to establish prejudice regarding Jazgar's failure to investigate or call additional witnesses because none of the proposed witnesses testified at the postconviction hearing. Gross also failed to develop any argument on appeal as to why he would not have entered his pleas if his counsel had advised him to testify. Gross had already informed the circuit court prior to the trial that he did not contest one of the strangulation counts or any of the misdemeanor charges. The plea deal essentially validated Gross's position that the State had overcharged on the homicide count and the other strangulation count, and it greatly reduced his sentence exposure. We conclude that the court properly denied Gross's plea withdrawal motion.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.